SULLIVAN *v.* APPLEBAUM.

1. TRUSTS—PAROL AGREEMENT—EVIDENCE—SUFFICIENCY.
    In a suit by stockholders and bondholders of an electric railway to enforce an alleged trust agreement, whereby one of the defendants, a creditor and bondholder of the road, agreed by parol to bid in the property on foreclosure sale for the benefit of complainants, a decree holding the evidence insufficient to establish the trust, under conflicting testimony, is affirmed on appeal.

2. RAILROADS—MORTGAGES—FORECLOSURE.
    The rights of stockholders, creditors, and bondholders of an electric road terminate on a decree of foreclosure of a trust mortgage of the assets of the corporation and the purchase thereof by one of the bondholders at public sale, since the trustee under the trust mortgage represented the bondholders as a party and the corporation represented the stockholders.

Appeal from Genesee; Wisner, J. Submitted November 18, 1910. (Docket No. 55.) Decided February 1, 1911.

Bill by Thomas G. Sullivan and Timothy E. Tarsney against Isaac Applebaum, the Saginaw & Flint Railway, the Valley Engineering Company, Edwin Henderson, Alexander J. Groesbeck, William I. L. Stearns, the Detroit Trust Company, trustee, Nelson A. Tabor and Mark Mitshkun, to enforce an alleged parol trust. Charlotte M. Tarsney, administratrix of the estate of Timothy E. Tarsney, was substituted as complainant on the decease of said Timothy E. Tarsney. From a decree dismissing the bill complainants appeal. Affirmed.

*Tarsney & Fitzpatrick, George W. Weadock, T. A E. Weadock,* and *Moore & Moore,* for appellants.

*Henry A. Harmon,* for appellee Detroit Trust Co.

*Edwin Henderson* and *Alex. J. Groesbeck, in pro. per.*

*Brown, Farley & Selby* and *Rundell & Stockton* (*Stevenson, Carpenter & Butzel,* of counsel), for other appellees.

STONE, J. The bill of complaint in this cause was filed for the purpose of establishing an alleged parol trust in favor of complainant Sullivan, and Timothy E. Tarsney, now deceased (hereinafter called complainants), as against defendant Isaac Applebaum primarily; and the other defendants (aside from the Detroit Trust Company) were impleaded, under the claim that they had invested their money in the purchase and construction of an electric railway from Saginaw to Flint, with knowledge of the terms of what is claimed to be defendant Applebaum's trust agreement that he should purchase for the benefit of complainants and other bondholders and creditors the property known as the Detroit, Flint & Saginaw Railway, at a fore-

closure sale under a mortgage given to the Detroit Trust Company, as trustee, to secure the bonds of such corporation, and that after such purchase, he, said Applebaum, would construct and complete said road for the benefit of said complainants, and other bondholders and creditors. Including the exhibits, there are upwards of 3,000 pages in this record, and no effort seems to have been made to reduce the testimony to narrative form. We have therefore been obliged to examine this large record, instead of a condensed one. The case briefly stated is as follows:

In June, 1908, defendant Isaac Applebaum purchased at foreclosure sale the property of the Detroit, Flint & Saginaw Railway—a proposed trolley line from Saginaw to Flint—for the sum of $50,000. At the time of this purchase, work of comparatively little value had been done on this line. The $50,000 purchase price was paid as follows: A little over $30,000 in cash was contributed by defendants Stearns, Groesbeck, and Henderson. A little less than $20,000 was contributed in bonds held by said Applebaum, which represented an investment of over $108,000. Soon after this purchase, which was effected in the name of defendant Applebaum and defendant Tabor, as trustee, the property was conveyed to the Saginaw & Flint Railway, a new corporation, being a trolley line organized after the foreclosure sale, under an arrangement whereby said Applebaum received in payment of his interest in said property bonds of the new railway. It is claimed by the defendants that these bonds are not worth more than the amount invested by defendant Applebaum in old bonds which he used to effect said purchase, and that they represent the only interest which said Applebaum has, or ever had, in said Saginaw & Flint Railway. After said Saginaw & Flint Railway acquired this property, the trolley line was completed from Saginaw to Flint, on somewhat different lines than originally contemplated. The money to complete this line was obtained in part from personal contributions from the other defendants, particularly from defendants Stearns and Groesbeck, in

part from the proceeds of the pledge of bonds of the Saginaw & Flint Railway, and in part on the credit of some of the other individual defendants. The work of completing said railway devolved on the other individual defendants, said Applebaum performing no service in that direction whatever.

The defendants claim that the amount of money required to complete this enterprise, exclusive of its original cost, exceeded $563,000. Complainants claim that the property so conveyed by defendant Applebaum to the Saginaw & Flint Railway is charged with a trust in favor of the bondholders and creditors of the Detroit, Flint & Saginaw Railway, and they seek in this suit a decree establishing said trust. It is evident that this claim is not based upon the ground that any of the property of complainants, any of the property of the bondholders, or any of the property of the creditors ever went into the trust, for it is clear that the foreclosure decree cut off the claims of bondholders and creditors. The only interest that complainants could possibly have had was an equity in the bonds held by defendant Applebaum. Complainants claim that such a trust exists, because and upon the ground that an agreement was made on October 1, 1906, whereby the defendant Applebaum obligated himself to purchase this property at a foreclosure sale, and to build the railway for the benefit of the bondholders, or for the benefit of the bondholders and creditors, or for the benefit of complainants. The case presents almost wholly a question of fact.

The learned circuit judge, who saw and heard the witnesses testify in this case and in the foreclosure case, filed a lengthy and exhaustive finding in this case, which is embodied in the decree dismissing the bill of complaint. It is so thorough and complete upon every issue raised and discussed, and so ably covers the entire case, that we have deemed it wise to insert it here. In the nature of things his acquaintance with the facts involved must be superior to ours, as well as his opportunity to form a

judgment upon the merits of the testimony of the numerous parties and witnesses examined before him. That finding is as follows:

"This cause having come on to be heard upon pleadings and proofs taken in open court, and after hearing the proofs and arguments of counsel and due consideration thereof being had, the court finds that the material allegations of the bill of complaint are not established, and further finds from the proofs aforesaid the following facts:

"(1) The Detroit, Flint & Saginaw Railway was organized on November 18, 1903, under the train railway act. Its incorporators were Timothy E. Tarsney, John A. Russell, Arthur S. Nester, Timothy Nester, and Thomas G. Sullivan. Its authorized capital stock was $1,000,000, which was all issued shortly after its incorporation to the above-named persons without any proper consideration being paid therefor. On December 1, 1903, it executed a trust mortgage to the Detroit Trust Company, trustee, under which bonds to the amount of $1,000,000 were authorized to be issued in accordance with the provisions of said mortgage.

"(2) This company during 1904 and 1905 built a line of street railway from the city limits of Saginaw to the village of Frankenmuth, a distance of about 11½ miles. It also erected a small power house in the township of Bridgeport, Saginaw county, and purchased two passenger cars, one construction car, and some six or eight ballast cars. During the time the road was being built, there were issued by authority of the board of directors $410,500 of the bonds of said company, the sum of $68,000 of which were sold to various outside parties, and most of the balance were issued to the incorporators for moneys which they claimed were contributed by them toward the enterprise.

"(3) It was the original purpose to complete the line by way of Frankenmuth to Flint, and also to extend the line northeasterly from Frankenmuth to Vassar.

"(4) Before the completion of the road to Frankenmuth and the building of the power house, the finances of the company and the incorporators became very badly entangled. The testimony shows that in 1906 the company was hopelessly insolvent. Large sums of money had been borrowed on the credit of the corporation and some of its

promoters, and a large amount of indebtedness had been incurred, none of which was the company able to meet as it became due and payable. There were outstanding judgments for a considerable amount unsatisfied. The company owed its men for operating the road several pay rolls, and during the two years prior to November 20, 1906 (when a receiver was appointed), proofs show there was a deficit of upwards of $20,000. Besides this, the company had defaulted in the payment of interest on its outstanding bonds, and had no money with which to meet the same. As the receipts came in they were kept in a box in the company's vault so that no one could reach same by legal process.

"(5) I find from the testimony that this line of road was very poorly constructed. Its ties and rails were for all practical purposes laid upon the grass along the public highway. Very little grading was done, and the track was not lined or properly ballasted; in fact the cheapest sort of construction prevailed throughout. The power house was poorly located, and its machinery ill adapted for the work of supplying power for a road from Saginaw to Flint. This machinery consisted of two small engines of 300 horse power each, attached to which there were two direct current generators of 250 kilowatt capacity. Practically all of the testimony shows that this equipment was wholly inadequate for the purpose of supplying power for an electric line between these two cities. Direct instead of alternating current was generated and the proofs established conclusively that the same was inadequate and inefficient for the purposes intended; that this kind of current cannot be transmitted for a distance of thirty miles with any satisfactory power or results; besides this, the engine and generators were entirely too small to supply such a line of road with electric current, and I am fully satisfied that the same were practically useless for such purposes.

"(6) The testimony also clearly establishes that the building of this line to Frankenmuth was a big mistake. This village has only 600 inhabitants, and is a roundabout way to go either to Flint or Vassar from Saginaw.

"(7) My conclusion is that, in the selection of the route between Saginaw and Flint and between Saginaw and Vassar, the poorest kind of business judgment was used; that the construction work was poorly and cheaply done; that the power house was improperly equipped; and that

the financing of the company itself was done along lines which would inevitably lead to insolvency and bankruptcy.

"(8) That Thomas G. Sullivan and Timothy E. Tarsney were officers and directors of said company during 1905 and 1906 and in complete charge of its affairs. Most of the franchises owned by the company had been allowed to expire; the bonds of the corporation had no market value; the road and its equipment were badly run down, due in part to lack of maintenance, and as early as 1906 the board of directors had authorized the placing of the company in the hands of a receiver.

"(9). In the month of November, 1904, the complainants, Tarsney and Sullivan, acting for the railroad, employed Mitshkun to negotiate a loan for the company, and agreed to pay him a 10 per cent. commission for his services. He procured the defendant Applebaum to loan said Tarsney and Sullivan and the Detroit, Flint & Saginaw Railway $60,000. As this amount was advanced by Applebaum, notes of the company indorsed by Tarsney and Sullivan, and secured by bonds of the railroad, were given to him, and contracts were drawn up by Mr. Tarsney which specified that the commission or bonus was to go to Applebaum, Mitshkun's name not being mentioned in these contracts. The amount of the commission was included in the notes, and some of the notes were payable to Applebaum and some to Mitshkun.

"(10) On March 14, 1906, all these notes held by Mitshkun and Applebaum were merged into one note of $69,-125.95, payable to Applebaum's order, made by Tarsney and Sullivan, and payable in four months from date with 6 per cent. interest. This note was secured by $147,000 face value of the bonds of the railroad.

"(11) When this last note matured, nothing was paid thereon, and Mr. Applebaum, through his attorneys, Humphrey & Grant, proceeded to sell the bonds under the terms of the pledge by advertising the bonds for sale in one of the Saginaw daily papers.

"(12) Thereupon Thomas G. Sullivan filed a bill in the Wayne circuit court, in chancery, claiming there was usury included in the $69,125.95 note. In this bill he set up that Mr. Tarsney had refused to join with him as a complainant, and therefore he was made a defendant together with Mr. Applebaum. The bill of complaint was drafted in the office of Tarsney & Fitzpatrick by Mr.

Fitzpatrick, Mr. Tarsney's partner. A temporary injunction restraining the sale of the bonds was issued. Mr. Applebaum filed an answer and moved to dissolve the injunction. The hearing on this motion was delayed for some time, and the case was set down for trial on the merits. The trial was had before Judge Hosmer, who, after listening to the testimony, ordered the injunction dissolved, stating at the same time that the same should not have been issued in the first place. Mr. Sullivan testified on that trial that he commenced the suit primarily to gain time, and also that his arrangement with regard to the 10 per cent. commission was with Mitshkun, and that he had offered to pay Mitshkun this sum if he would procure the loan. The injunction was dissolved on September 26, 1906. Sullivan then went to Saginaw and employed James H. Davitt to file a bill of complaint in the Saginaw circuit court in the name of Father Reiss (who held a small amount of the Detroit, Flint & Saginaw Railroad bonds), which bill set up substantially the same matters which had been litigated and decided in the suit before Judge Hosmer. He had Mr. Tarsney and himself made defendants in this last suit along with Mr. Applebaum. All the information necessary to the drafting of the bill was furnished by Sullivan to Mr. Davitt. The question sought to be litigated was the same identically as had been decided by Judge Hosmer, to wit, the charging of usury and including thereof in the note of $69,125.95.

"(13) Sullivan about the same time made an application to the Supreme Court for an order staying the sale of the bonds held by Applebaum, during the pendency of an appeal to that court, and also that he be allowed to file a bond on appeal in a much smaller sum than that ordered by Judge Hosmer. In his petition to the Supreme Court which was drafted by Mr. Fitzpatrick and Mr. Moore, he swore that Mr. Tarsney was a necessary witness in his behalf; that he, Tarsney, had been away from Detroit during the trial of the case in the Wayne circuit court, and that consequently his testimony could not be taken during the trial, and that Judge Hosmer had indicated that on his return his testimony might be given and considered a part of the record.

"(14) Mr. Tarsney was sworn as a witness in the trial of the foreclosure case of the *Detroit Trust Company* v. *The Detroit, Flint & Saginaw Railway* (which will be

hereafter referred to) and testified that he never had questioned the $69,125.95 note; that he negotiated the loan through Mr. Mitshkun; that he did not know what Sullivan's motive was in starting the suit against Applebaum; that he knew the bonds could be sold under the pledge.

"(15) I find from the proofs that the suit commenced by Sullivan in the Wayne circuit court, according to his own testimony, was for the purpose of gaining time and was an imposition on that court; that the petition filed in the Supreme Court did not truthfully state the facts concerning that litigation, and that the statement contained therein to the effect that Sullivan desired Mr. Tarsney's testimony was a misrepresentation of the fact, and a fraud upon the court; that the commencement of the suit in Saginaw county through the use of Father Reiss' name as complainant, and the naming of himself and Mr. Tarsney as defendants therein, when he knew that the question involved had just been adversely decided in the Wayne circuit court, constituted a fraud upon the court.

"(16) On November 24, 1905, Timothy E. Tarsney and Thomas G. Sullivan gave their note to the Home Savings Bank of Detroit for $4,000, payable in four months. On the same day they executed another note to this bank for $5,287.57, payable in four months, and on March 21, 1906, they gave their note to the same bank for $7,691.62, payable in 60 days. These notes bore 6 per cent. interest and were secured by 67 bonds of the Detroit, Flint & Saginaw Railway Company, 960 shares of Yarnell Gold Cure stock, and also all equity of Tarsney and Sullivan in and to bonds in possession of Isaac Applebaum and also by an unrecorded third mortgage on some land owned by T. G. Sullivan.

"(17) The proofs established that during the trial of the case of *Sullivan* v. *Applebaum* in the Wayne circuit court, and before its decision, Mr. Applebaum negotiated with the Home Savings Bank for the purpose of buying these notes; that on September 28, 1906, he gave said bank a check for $500 to bind the bargain, he having agreed to pay for same the amount of the principal and interest due thereon. It was conclusively proven that he did this entirely for his own protection and because Mr. Sullivan was disputing his right to sell the bonds that were up as collateral to the $69,125.95 note.

"(18) The proofs show that on or about October 1, 1906, said Thos. G. Sullivan applied to Mr. Applebaum

and his attorneys for an extension of time, and wanting to know if there was not some agreement that Mr. Applebaum would make which would give him time to work on a settlement of the company's affairs. He was told flatly there was not; that Mr. Applebaum intended to reduce these bonds to his ownership and possession. Later, and in the evening of October 1, 1906, Mr. Tarsney and Mr. Sullivan stated that they would transfer whatever equity they had in the bonds to Mr. Applebaum; Mr. Tarsney saying that he did not want them sold at public auction because of personal reasons.

"(19) An assignment of the $147,000 bonds which were up as collateral to the note of $69,125.95 was then made by Tarsney and Sullivan to Applebaum. This assignment was absolute in form. The proofs in this case show clearly and conclusively that before Mr. Applebaum took this assignment both he and his attorneys told Mr. Tarsney and Mr. Sullivan that, if either of them ever intended to claim any interest of any kind in and to the bonds so assigned, Mr. Applebaum would not take the assignment, but would go ahead and sell at public auction. Both Tarsney and Sullivan said they understood this perfectly, and that the assignment transferred all interest they or either of them had in the bonds.

"(20) I find as a matter of fact, and the proof is overwhelming on this question, that it was then and there expressly agreed and understood on the part of Tarsney and Sullivan with Mr. Applebaum that in the taking of the assignment of these bonds that the same was unconditional, and that Mr. Applebaum assumed no legal, moral, or equitable obligation to either Mr. Tarsney or Mr. Sullivan with reference thereto. I find as a matter of fact that the testimony of said Sullivan, wherein he stated that Mr. Henderson (one of Applebaum's attorneys) stated at said time that Mr. Applebaum would have to be a trustee for Tarsney and Sullivan, is not established by the proofs.

"(21) I also find as a fact that the allegation in the bill of complaint to the effect that Mr. Applebaum agreed to purchase the Home Savings Bank bonds on October 1, 1906, is not in accordance with the facts. The uncontradicted proofs show that Mr. Applebaum had arranged for their purchase before the dismissal of the bill of complaint and the dissolution of the injunction by Judge Hosmer in the *Sullivan* v. *Applebaum* case on September 26, 1906.

"(22) I also find as a fact that said Sullivan's testimony

to the effect that Mr. Applebaum agreed on October 1, 1906, to build and complete the road between Saginaw and Flint, and to turn over to Tarsney and Sullivan anything he had left after so doing is unqualifiedly false and unsupported by any other testimony in the case, or by any of the circumstances surrounding the transaction, and is in direct conflict with his own testimony given in the suit of the *Detroit Trust Company* v. *Detroit, Flint & Saginaw Railway Company,* wherein he repeatedly stated that Mr. Applebaum would make no agreement with him or Mr. Tarsney and that he assumed no liability of any kind whatever either toward Tarsney and Sullivan, or any other person.

"(23) The testimony also shows, and I find the fact to be, that the purchase by Mr. Applebaum of the eight bonds held by James B. Peter of Saginaw had no connection whatever with the assignment of October 1, 1906, of the $147,000 worth of bonds made by Tarsney and Sullivan to Applebaum; that it was a separate transaction entirely.

"(24) At the time Mr. Peter assigned these bonds to Mr. Applebaum complainant Sullivan gave Mr. Applebaum a letter in which he stated that he made no claims upon the Peter bonds, and that Mr. Applebaum took the same free from any equity or other claim on his part. His explanation of this letter on the stand as shown by the testimony does not appeal to me.

"(25) At the time the $147,000 worth of bonds were assigned to Mr. Applebaum under the circumstances herein stated, there was some talk had concerning the capital stock of the corporation. It was stated to Mr. Tarsney and Mr. Sullivan by Mr. Applebaum's attorneys that the other stockholders, and particularly Nesters, claimed that Sullivan and Tarsney were responsible for the insolvency of the corporation; that the Nesters and other interests represented by them were willing that the bondholders and creditors should have the property, and that they would wipe out or cancel their stock if Tarsney and Sullivan would do the same, and that they (the Nesters) had proposed to turn their stock over to Mr. Applebaum for these purposes if Tarsney and Sullivan would do likewise. Both Tarsney and Sullivan said they would do this, and I find that within a few days thereafter assignments of the stock were made by practically all the stockholders to Applebaum.

"( 26 ) The facts as developed by the testimony show conclusively that these assignments were made by Tarsney, Sullivan, and the Nesters for the reason that they desired this stock, which they had paid nothing for, gotten out of the way so that if the road could be sold or new capital interested, there would be no outstanding stock which could be used for the purpose of holding up or preventing its consummation.    I find as a fact that Mr. Applebaum and his attorneys stated clearly and unequivocally to all these stockholders, that in the taking or holding of the stock he would assume no legal, equitable or moral obligation to them or to any other persons or to the company itself; that he wanted his money, and that if these parties and other bondholders and creditors would co-operate with him he would attempt to bring order out of chaos, and see if there was not some way that the creditors and bondholders could get at least a part of their money back; that whatever he did in the matter must be left to his own discretion and judgment, and that in no event would he assume any liability or obligation of any kind or nature to any one.    The proofs are conclusive that complainants fully understood the matter in this way—as did all other stockholders.

"(27) I further find that while Mr. Applebaum was under no obligation so to do, yet he did undertake to get the bondholders and creditors to join and assist in untangling the company's affairs and to this end that he and his attorneys spent considerable time in attempting to obtain their co-operation; that he was unsuccessful because of no fault of his own.    I find as a fact that all efforts made by him were met in a hostile and antagonistic spirit by the bondholders and creditors, and that nothing in consequence thereof along the line of effecting a settlement of the company's affairs could be accomplished; that said Applebaum then determined to ask the Detroit Trust Company, trustee, to foreclose the mortgage; that he made known his determination to said Sullivan, who said he was adverse to a foreclosure.    Mr. Applebaum's attorneys informed Sullivan that he could join in the request or not as he chose.    Sullivan then did join in requesting the trust company to foreclose the mortgage.    At that time Sullivan was the owner of but $3,500 of the company's bonds.    It is alleged in paragraph 10 of the bill of complaint that $3,000 of the $3,500 worth of bonds so owned by Sullivan were up as collateral to an

indebtedness of $2,100 owing by Sullivan and that Applebaum on October 1, 1906, had agreed to take up this loan. I find this allegation and Sullivan's testimony in support thereof untrue. The facts show clearly that M. Mitshkun, one of the defendants, purchased these bonds from Sullivan under a written contract in November, 1906, and that their purchase was not even talked about in October.

"(28) On November 19, 1906, the Detroit Trust Company as trustee filed a bill of complaint in the Genesee circuit court, in chancery, against the Detroit, Flint & Saginaw Railway, the Prather Engineering Company, and the Harrisburg Foundry & Machine Works, setting up the insolvency of the railway company, its failure to pay the interest on its bonds, etc., and asking for the appointment of a receiver. The Prather Engineering Company and the Harrisburg Foundry & Machine Works were joined as defendants because of certain liens they claimed to have against some of the property of the railway. The court appointed the Detroit Trust Company receiver, which at once took possession of the property, and continued to operate the road until August, 1908.

"(29) From the time of the appointment of the receiver in November, 1906, until the case was tried in April, 1908, I find from the testimony that Thos. G. Sullivan made various endeavors to interest different parties in the railway. These efforts contemplated the procurement of capital and the completion of the road to Flint. Mr. Applebaum had nothing to do with this, and took no part in the negotiations. Said Thos. G. Sullivan did not make known to him or his attorneys who he was dealing with, or what his plans were further than to ask said Applebaum what he would take for his bonds. I find that the acts of said Sullivan in this regard were entirely inconsistent with the allegations set out in the bill of complaint in this case to the effect that Applebaum was acting as a trustee and that he had agreed to build and equip this road. Mr. Applebaum's position throughout was that he wanted his money, and that he would give said Sullivan and Tarsney an option on his bonds for a reasonable time. That he would not enter into any reorganization deal with said Sullivan or Tarsney or any other bondholder as proposed by said Sullivan, and that if the road was sold he would take his pro rata share of the proceeds under his bonds. The proofs conclusively show this. They also

show that the complainants in this case thoroughly understood his position, and, until the filing of the bill in this case, made no other or different contention.

"(30) One of the issues tried in the foreclosure suit was the ownership of the outstanding bonds of the Detroit, Flint & Saginaw Railroad. Mr. Applebaum at that time owned $226,500 of these bonds which included the $147,000 above referred to. This matter was gone into extensively at the trial of that case. The complainants here were interpleaded in that suit, and had full notice of all proceedings had therein. They were both sworn as witnesses on that issue, which directly involved the ownership of Mr. Applebaum's bonds. Complainant Sullivan was present in court during the entire time testimony was being taken with regard thereto. I find as a fact that both complainants well understood the nature and extent of said issue. The whole subject-matter concerning Mr. Applebaum's holdings, how he acquired them, his dealings with Tarsney and Sullivan, were fully and exhaustively investigated and inquired about. Mr. Sullivan was sworn as a witness by the Prather Engineering Company, and all of his and Mr. Tarsney's relations with Applebaum were brought out. Neither he nor Mr. Tarsney when under oath in that suit made any claim that Applebaum was acting as a trustee for them or either of them, or that he was under any obligation, contractual or otherwise, to them. Their testimony in that case can in no manner be ⸢reconciled with that given by them in this suit.

"(31) Both of the complainants were present during the hearing in the foreclosure suit to determine the ownership of bonds, and both heard Mr. Applebaum's position with regard thereto placed before the court. That position was that Applebaum wanted his money; that he owned the bonds in his possession free from any lien, claim, or obligation to any one; that he had offered to take considerably less than he had invested in them; that he was willing to give complainants an option on them for a reasonable time; that he would not enter into any deal whereby his bonds would be in any manner obligated or whereby he would agree to buy in the road; that in case the road were sold he would take his pro rata of the proceeds with the other bondholders. After a full hearing as to the ownership of these bonds, the court made an order determining that question, which order set out the names of the various parties entitled to participate in the proceeds

of the sale under the decree of foreclosure. Among others Mr. Applebaum was decreed to be the bona fide owner of $226,500 of these bonds. It was further decreed that Mr. Applebaum's attorneys having stated in open court that he (Applebaum) was willing to accept the amount he had invested in the bonds which was $108,273, the court ordered that if there were anything in excess of this amount realized from the bonds owned by him that such surplus would be impounded to await such disposition as the court might direct for the benefit of the creditors of said corporation. From this decree there was no appeal taken by either of the complainants.

"(32) The property of the Detroit, Flint & Saginaw Railroad Company was decreed to be sold at public vendue under the terms of the mortgage. The facts in this case show that the widest publicity was given to such sale. The receiver advertised the same very extensively through the newspapers and railway journals, and by writing to every person whom it could ascertain might be interested in the property. At the first offering there were no bidders. At the second Isaac Applebaum bought the property of the railway for $50,000. The testimony clearly shows that this amount was a fair price for the property, and I find that it was all the same was worth. After the sale it was represented to the court that $60,000 could be obtained for the property. The court then held the confirmation of the sale in abeyance for 10 days to give all parties an opportunity to raise the bid made by Applebaum. During those 10 days the receiver made every effort possible to procure a higher bid to be made. Its efforts were unsuccessful and upon the expiration of that time the sale to Applebaum was confirmed. I find specifically that in the advertising and sale of this property that the receiver did everything within its power to secure a fair price for the same. That there was no collusion between it and Isaac Applebaum or any other person as alleged in the bill of complaint. Also, that there was no agreement or understanding between the complainants or either of them and said Applebaum regarding the purchase of said road or the bidding at said sale. I also find that said complainants were repeatedly told prior to said sale both by Mr. Applebaum and his attorneys that said Applebaum would not enter into any arrangement with complainants or any other person for the purpose of buying in said property or bidding at such sale. I also find

that Mr. Applebaum did not desire to purchase said road as he did not have the means so to do, and that complainants had full knowledge of his position in that regard. I therefore find all allegations in the bill to the effect that there was any collusion between said Applebaum and any other person, and the further allegations that said Applebaum, and the other defendants misled complainants in any manner, and that he schemed to bid the property in at a low figure, to be entirely groundless and untrue. I further find that a short time prior to the sale of said railway by the receiver said Thomas G. Sullivan applied to said Applebaum and his attorneys for an option on the bonds which said Applebaum owned, and that an option to purchase same was given him which was to expire on June 1, 1908; that this option was not exercised by said Sullivan. In the taking of said option said Sullivan was acting for himself and complainant Tarsney.

" I further find that after said Applebaum had bid the property in at public sale, said Sullivan, acting for himself and said Tarsney, applied to him for an option on the property. Said Sullivan represented that he was able to carry out the deal and pay said Applebaum the amount agreed upon at that time. He was given a 10-day written option. This option expired without anything being done by either of complainants.

"(33) At the time defendant Applebaum bid in the property he was required to pay down $5,000 on the purchase price. The balance of $45,000 was to be paid within 30 days from the date of sale. Under the terms of the decree the bonds which he held would be entitled to their pro rata share of this last amount, and Mr. Applebaum under the mortgage and decree was authorized to use his bonds for the purpose of completing his bid. As figured by the receiver, the amount that his bonds would be entitled to credit for would be $19,553.14, so that he was required to pay $25,046.87 additional in cash to the receiver.

"(34) The evidence shows and it is uncontradicted that during the year 1907–1908 Mr. Applebaum became and was financially embarrassed. His health gave way, and he was obliged to put up all his property in the hands of his bank to get money to pay his creditors. Besides his real estate which amounted to considerable, and other collateral that he had, he also placed the bonds of the Detroit, Flint & Saginaw Railroad Company up as col-

lateral with the Peninsular Savings Bank. The evidence is undisputed that, besides being unable to raise the cash to complete his purchase, he was unable to make any arrangements with his bank to release his bonds so they could be used in the partial payment of the purchase price. I find that he then applied to his attorneys, the defendants Edwin Henderson and A. J. Groesbeck, for assistance. They interested William I. L. Stearns and Nelson A. Tabor, two of the defendants herein, and the four of them raised enough money to complete the bid and also to release the bonds in the hands of the banks. Upon payment being made to the receiver on, to wit, August 10, 1908, a deed of the property was executed by it to Isaac Applebaum and Nelson A. Tabor, trustee, the latter acting for himself, Stearns, Groesbeck, and Henderson. This deed was immediately recorded in the counties of Saginaw, Tuscola, and Genesee. I further find, and the evidence in this regard is undisputed, that prior to the time the money to complete the purchase price was raised by the parties last mentioned, the complainant Tarsney, through his law partner, William G. Fitzpatrick, applied to defendant Applebaum, and requested said Applebaum to use the bonds in the name of Timothy E. Tarsney, trustee, Timothy E. Tarsney, individually, William G. Fitzpatrick, and Richard I. Lawson in completing the purchase, proposing that these bonds should be used for such purposes so far as they would go, and that these parties would advance their share of the cash together with said Applebaum and be considered joint owners in the purchase. The evidence is also undisputed that Mr. Applebaum rejected this proposition, and stated that under no circumstances would he have Mr. Tarsney, Mr. Sullivan, or any of the other parties named as partners. I also find that complainant Sullivan was fully informed of Mr. Applebaum's intention in this regard. I therefore find that the allegations contained in the bill of complaint to the effect that Applebaum had agreed to use the bonds controlled by complainant Tarsney in completing the purchase of the road to be wholly untrue.

"(35) The proofs show that, after said Applebaum had refused to consider the use of the bonds controlled by said complainant Tarsney, William G. Fitzpatrick applied to said Applebaum, and stated to him and his attorneys that Tarsney was in difficulty with the Hude estate, and was involved in some litigation pending in the Wayne

circuit court in chancery, which was about to be decided adversely to said Tarsney, and which said adverse decision as stated by said Fitzpatrick would reflect not only upon said Tarsney, but upon him, said Fitzpatrick; that said Tarsney desired to purchase from said Applebaum the Yarnell Gold Cure stock which said Applebaum had come in possession of at the time he purchased the notes given by said complainants to the Home Savings Bank. Said Fitzpatrick represented that Tarsney would pay said Applebaum $1,000 for said stock. The facts show that said Applebaum and his attorneys stated to said Fitzpatrick, while they were desirous of assisting said Tarsney, yet they did not like the manner in which said Tarsney testified on the foreclosure sale. That if said Tarsney claimed that Applebaum owed him any duty in respect to said bonds or the stock which had been transferred to him it was due to Applebaum that Tarsney should state it at that time. Said Fitzpatrick replied that said Tarsney made no claim against Applebaum and had none, nor could he have any claim against Applebaum, as said Applebaum and his attorneys well knew. Said attorneys then stated that before they would sell the Yarnell Gold Cure stock to Tarsney they would require said Tarsney to execute a writing to the effect that he made no claim upon said Applebaum whatever, as they did not want Applebaum involved in any litigation. That said Fitzpatrick replied that Tarsney would do this, and I find as a matter of fact that Tarsney did execute such a paper and deliver it to said Applebaum and his attorneys and that said paper was accepted in good faith by said Applebaum and his attorneys as and for a complete release of any and all claims which said Tarsney might make against said Applebaum. I further find said complainant Tarsney is estopped by his conduct and by the conduct of his representative, William G. Fitzpatrick, from now claiming that said paper was not an absolute release and discharge to said Applebaum of all claims and demands said Tarsney might make against Applebaum. I also find that at the time of the making of said paper of August 7, 1908, neither said Tarsney nor said Sullivan had any claims either legal or equitable against said Applebaum.

"(36) On August 20, 1908, the Saginaw & Flint Railway, a Michigan corporation, was organized; its incorporators being Nelson A. Tabor, trustee, Mark Mitshkun,

164 MICH.—29.

and A. J. Groesbeck. The property was then conveyed by Isaac Applebaum and Nelson A. Tabor, trustees, to said Saginaw & Flint Railway, the consideration therefor being $200,000 of its bonds, payable when the road was completed between Saginaw & Flint. These bonds represented the $108,274 invested by Applebaum, moneys and attorney fees of defendants Groesbeck and Henderson and the moneys which Stearns, Henderson and Groesbeck had advanced to complete the purchase of the road.

"(37) Subsequently and in the month of September, 1908, there was organized by the defendants Henderson and Groesbeck and Harry Henderson the Valley Engineering Company, a Michigan corporation. This latter company entered into a contract with the Saginaw & Flint Railway to complete the construction of the road between Cook's Corners and the city of Flint, and take in payment therefor $600,000 of bonds of said railway. Work was commenced in September, 1908, and the line between Cook's Corners and Flint was completed and put in operation on the 25th day of February, 1909, the greater portion of the work having been completed prior to the filing of the bill in this case. I find specifically that no part of the money raised by said Valley Engineering Company was contributed by said Applebaum, either directly or indirectly; that said Isaac Applebaum had no relation whatever or connection with said Valley Engineering Company; that he did not own, directly or indirectly, any of the stock of the Saginaw & Flint Railway or any of the stock of the Valley Engineering Company, and that the only interest which he had in said enterprise after the formation of the said Saginaw & Flint Railway was his interest in the $200,000 of bonds hereinbefore mentioned. I find specifically that the said Isaac Applebaum and said Nelson A. Tabor, trustee, took a valid and clear title to the property hereinbefore mentioned, free from any liens or claims of any kind on behalf of said complainants or either of them; that the Saginaw & Flint Railway procured for a valuable consideration a clear and free title to said property by virtue of the deed executed by said Isaac Applebaum and said Nelson A. Tabor, trustee. That said complainants had no interest or claim to any part of the bonds of said Valley Engineering Company. That there was no collusion between any of the defendants and said Applebaum for the purpose of defrauding the complainants, as alleged in the bill. But, on the contrary, all of

the parties defendant herein, in carrying on the work of completion of said road, and raising money for that purpose, acted in good faith without any notice or knowledge of any claim such as is set up in the bill of complaint in this cause.

"(38) I further find that complainants knew prior to the purchase of said road and prior to the payment of the purchase price therefor, that the said Applebaum denied that he was under any obligation to them, either legally, morally or equitably. They knew that said road was being constructed and that vast sums of money were being invested by the defendants in this case in and about completing said line and knew of the progress of the work and deliberately stood by and made no claim until the work was practically completed.

"(39) I find that as a matter of law that by this conduct of the complainants as well as for the reasons before given they are estopped as against the defendants in this case from setting up the claims made in the bill of complaint herein. I further find in this connection that neither of the complainants prior to the filing of the bill in this case made any demand upon Applebaum nor any of the other defendants in this cause covering the subject-matter of their present bill of complaint, and that the allegations in said bill of complaint in that respect are unfounded and untrue."

It is evident that the crucial question to be answered in this case is, Was such an agreement as is claimed by complainants made by defendant Applebaum with them on October 1, 1906? The claim is based upon what took place at the conference between the two complainants and defendants Applebaum, Mitshkun, Groesbeck, and Henderson at that time. It is undisputed that at that time defendant Applebaum held $147,000 par value in bonds of the old company as security for an indebtedness owing to him by the complainants. He was at that time, and had been for some time prior thereto, proceeding to make a sale of those bonds, and thereby obtain legal title thereto. Complainant Sullivan had, by procrastinating litigation interposed for the purpose of delay, tried to enjoin this sale. It is not denied that on October 1st complainants executed a writing absolutely assigning to said Apple-

baum, their interest in those bonds, though the said Applebaum did not release them from their obligation to pay their indebtedness secured thereby. At the same time complainants transferred to said defendant Applebaum all the stock held by them in the old corporation. This stock amounted to about $400,000 par value. It never had been paid for, and it was considered intrinsically worthless. Its only value may be said to have been an annoying value; that is, whoever possessed it might use it to obstruct the project to sell or reorganize the railway. About the same time Timothy Nester, and others in his family, had assigned to, or agreed to assign to, said Applebaum the balance of the stock of said old railway, about $600,000 par value, which was also unpaid for and of no value. At this time the old railway was hopelessly insolvent, it owed more money than it could pay, and its creditors were clamoring for immediate payment; and two of said creditors, namely, the Prather Engineering Company and the Harrisburg Foundry & Machine Works, were seeking to enforce their claims as liens on the property. See *Prather Engineering Company* v. *Genesee Circuit Judge*, 149 Mich. 53 (112 N. W. 502).

We are now confronted with the question, Was such an agreement as is claimed by complainants made by defendant Applebaum on October 1, 1906? In the discussion of this case at the hearing before us we understood counsel for complainants to admit that, as respects that issue, there was on one side the testimony of complainant Sullivan corroborated by the testimony of Mr. Tarsney; and on the other side the testimony of defendants Applebaum, Mitshkun, Groesbeck, and Henderson. It was also claimed by complainants' counsel that, in the answer filed by defendants Applebaum and Mitshkun to a certain bondholder's petition in the foreclosure case, those defendants made statements which corroborated complainants' claim. In complainants' reply brief, filed since the oral argument, complainants' counsel also asserted that complainants' contention in the case is corroborated by the

testimony of some of the defendants, either in this case or in the foreclosure case. This has necessitated a careful examination of this testimony.

The vital question in the case is, What, if anything, did defendant Applebaum agree to do when the $147,000 of bonds were assigned to him, and the stock transferred to him by complainants? Did the agreement extend to, and contemplate the foreclosure of the mortgage held by the Trust Company?

It is the claim of complainants that the agreement of defendant Applebaum was so broad that he agreed, if it became necessary, to purchase the railway at the foreclosure sale, and to complete the road for the benefit of the bondholders and creditors of the old corporation. Defendants deny this, but admit that at that time defendant Applebaum did agree to endeavor to close up the affairs of the then existing railway company, if the others interested would co-operate, with full latitude as to choice of methods to be used by him. In other words, it was expected that he would endeavor to handle the affairs of the old road in co-operation with everybody interested, and for the benefit of everybody interested. It seems to be conceded that on that occasion it was distinctly stated that Applebaum should not be put in the position of a trustee. This would not prevent his being a trustee if that was the actual relation. We think that the position did place upon him certain obligations. If he was to take the bonds and endeavor to close up the affairs of the old company, or complete the road, or in some way use his best endeavors to clothe the old company with new life and vigor, with the co-operation with others interested, without any reference to the foreclosure of the mortgage, it is useless to spend time to discuss the question whether he was a trustee or not; for if that was his relation to complainants, and the bondholders and creditors, and he, Applebaum, went forward and in good faith endeavored to accomplish what he had agreed to do, then he fully performed the trust. So it is fruitless to spend time in discussing this

matter until we solve the question whether it was contemplated that in case his efforts failed, and the foreclosure was resorted to, he agreed to bid in this property for the benefit of the bondholders and creditors of the old corporation. All agree that the efforts to either close up the affairs of the old company, or raise the means wherewith to pay the debts and finish the road, and go on in the name of the old corporation, proved futile. It is useless for us to recite the history of this matter, showing how defendant Applebaum was met with obstacles at every turn. Nester served notice that his assignment of stock had been obtained through fraud. No arrangements could be made to pay the debts of the old corporation. Efforts were made to settle with the Prather Engineering Company, but they failed. The attitude of the bondholders known as the Saginaw bondholders was antagonistic, and the time was reached, after weeks of effort, when Mr. Applebaum became satisfied, acting, as we think, in good faith, that it was useless to attempt to adjust the affairs of the old corporation, and he came to the conclusion that a foreclosure of the mortgage was absolutely necessary, and complainant Sullivan joined with him in renewing the request that foreclosure proceedings be commenced.

Did the agreement on the part of Applebaum extend to foreclosure proceedings ? In other words, were the foreclosure proceedings a part of the method by which he had proposed to straighten out, if possible, the affairs of the old company ? As we have said, complainants claim, in their reply brief, that the answer of defendants Applebaum and Mitshkun to the bondholders' petition admits the alleged trust, as claimed by complainants. We have read with great care this answer, and we regret that the same cannot be inserted here, but its length forbids that course. We quote, however, therefrom as follows:

"That it was represented to said Applebaum that the bondholders of said railway who lived in the said city of Saginaw would readily co-operate for the purpose of either reorganizing said railway, or placing its affairs in a posi-

tion where said road could be sold and disposed of to an advantage; that after considerable had been said along these lines by the parties mentioned, the question of the outstanding stock came up; that it was proposed by said Thomas G. Sullivan and said Timothy E. Tarsney that if the remaining stockholders outside of themselves, and particularly the Nesters, would transfer their stock to said Isaac Applebaum for the purpose of placing the said corporation in a position where its affairs could be handled to advantage, that they, the said Thomas G. Sullivan and Timothy E. Tarsney, would do likewise; that said Timothy Nester and said Arthur S. Nester agreed that this was the best thing to do, and congratulated the said Isaac Applebaum upon being able to get said Sullivan and Tarsney in a frame of mind where they would do what is above set forth; that said Applebaum said to said Sullivan and Tarsney, said Arthur S. Nester and Timothy Nester, that he would hold the outstanding stock of said corporation for the said corporation's benefit of its creditors, and for no other purpose, and that if the affairs of the company could be straightened out without the necessity of the foreclosure of the mortgage, either by sale or otherwise, he would do everything in his power to accomplish that end, and that he would hold said stock for said corporation and its creditors, so that in case of a sale of the property and franchises of the road, or in case of a reorganization of said railway, it would be possible to turn over to said creditors thereof a complete and clear title; that in pursuance of said understanding, and that alone, and for the benefit of said corporation and its creditors, said Applebaum took from the said parties holding the stock of the said company, whether the same was in trust or otherwise, assignments thereof, and held the same until a few days after the commencement of the foreclosure suit in this court; that the said Applebaum expressly stated to said parties, and to everybody concerned in said railway, whom he had opportunity to meet, that if he found it impossible to bring about any settlement of its affairs, that said stock would be transferred to the treasurer of said corporation by him, and the said Mitshkun, which was done; that after taking the said transfers under the aforesaid conditions, and under the belief that he was dealing with men who recognized that many mistakes had been made in the carrying on of the said railway's business, and

that the internal disputes which had constantly arisen should be forgotten, and that all should turn in and help to bring about satisfactory results, proceeded to carry out, so far as lay in his power, the plans and ideas which had been suggested for the purpose of accomplishing such results; that the assignment of the stock given by said Arthur S. Nester and Timothy Nester was dictated by said Mr. Timothy Nester to Mr. Leland B. Case, a stenographer in the United States district court, who resided in the city of Detroit; that it was stated by said Timothy Nester that a portion of this stock was standing in the name of one Duffey, a relative of said Nester, and that he, said Duffey, had placed the same up for collateral security for a loan of some $12,500 with a bank at Chicago, Ill., and the assignment of said stock was made by said Nester subject to said loan, the stock itself not having been delivered by any of said parties to said Applebaum, and he only obtained a written transfer thereof; that in and by said transfer there was no obligation placed upon said Applebaum to pay the sum of $12,500, or to said Duffey, or to any one connected with said bank; and it is charged, upon information and belief, by these defendants that said loan of $12,500, so claimed by said Nester to have been made by a bank in Chicago, was a myth, and was a part and parcel of the scheme which said Nesters had in their minds to compel said Applebaum to pay said sum of $12,500."

Without quoting further from this answer, it may be said that it proceeds to state *in extenso* what Applebaum did, how he endeavored to place said railway in a condition where its assets and franchises would be made more valuable, and that upon investigation he found that nearly all the franchises which had been obtained by the original promoters of said railway, and which had been transferred to said railway, were in a precarious condition, because the time limit within which said railway company had agreed to commence operations to lay tracks had expired; that he caused his attorneys to procure an extension of these franchises and spent considerable time himself upon this undertaking; that after a great deal of work, and considerable expense which he was obliged to pay out of his own pocket, he procured from the township

and villages through which it was intended to build and operate said railway, additional franchises, or extensions of those previously obtained, and turned the same over to the railway; that he caused a survey of the whole of the line of said railway to be made, so that the said company would be in a position to clearly define and explain all of the conditions existing between the cities of Flint and Saginaw, and to properly lay before any parties interested a full and complete history of the franchises, rights, and other assets, of said railway company, and also the possibilities of said company in case said line of railway were completed; that besides these things he had contracted for steel rails at a very low price, which contract he was willing to turn over to said railway company as soon as it was in position to go ahead with the work of construction; that in addition thereto he obtained private rights of way for a considerable portion of the line between the city of Flint, Genesee county, and Cook's Corners, Saginaw county; that he took options upon private rights of way between these places in his own name as trustee, which he afterwards turned over to the attorneys for the receiver in the cause; that besides this he bent every effort towards obtaining an adjustment of the differences between the stockholders and bondholders of said corporation, and was willing himself, at all times, to co-operate with every bondholder and creditor, either upon the basis of reorganization of said road, or upon the basis of a sale of said road, and was at all times willing to take his proportionate share of such means as might be realized out of the reorganization or sale of the road, based upon the actual money that had been invested by the respective parties. He proceeds to state how he worked, together with his attorneys, night and day, for the purpose of accomplishing these ends. He states his difficulty with the Nesters, and that he became satisfied that they and other advisers were not acting in good faith; how said Nester pretended that the said Applebaum had taken individually, and for himself, the assignments of the stock hereinbefore mentioned;

how Nester then proceeded to serve notice upon everybody connected with the affairs of the old company, to the effect that his assignment of stock was void; that an attempt was made to hold him liable as a stockholder;.that he was continually harassed by said Nesters and their associates; that he attempted to learn the names of the bondholders residing in the city of Saginaw and vicinity; that he was unable to do this on account of the methods and tactics used by said parties in their fight against him; that he expended, outside of attorneys' fees and outside of his own time, which extended over a period of three or four months, an actual outlay of upwards of $3,000 towards placing the said railway company and its franchises in a proper condition; that he did this in the best of faith, without attempting to obtain any advantage to himself, or to any other creditor of said railway company, excepting that all should share alike, and for those reasons, and those alone, and because of his inability to do anything at all within reason with the parties mentioned, or with said railway company and its affairs, because of the opposition indicated, he finally became satisfied of the futility of his efforts and requested the Detroit Trust Company, as trustee, under said mortgage, to commence foreclosure proceedings.

We cannot assent to the claim of complainants' counsel that the answer of said defendants Applebaum and Mitshkun admits the trust as alleged by complainants. Neither does the contract of October 10, 1906, between defendant Applebaum and Mr. Tarsney respecting the Hude bonds, create any such trust.. Quoting from that contract there is this language:

"Said Applebaum agrees to use his best endeavors in bringing about a settlement of the affairs of the Detroit, Flint & Saginaw Railway; it being expressly understood, however, that the steps which he shall take, either as to the time or manner of settling the same, or in any other respects in regard thereto, are left solely to his discretion and judgment."

We think that this obligation has been performed on the part of Applebaum.

We do not understand that there is any complaint by complainants of anything done by these defendants before the commencement of the foreclosure proceedings. Still complainants' counsel urge that, while Mr. Applebaum was to have his own way as to the method, he specifically agreed in the contract above quoted from, to bring about a settlement of the affairs of the Detroit, Flint & Saginaw Railroad, and that he was authorized and bound, as one of the ways, to foreclose the mortgage, to buy in the property, and reorganize, in the interest of all the bondholders and creditors. We do not so read the contract. We think that counsel have here ingrafted upon that arrangement a proposition which had never been discussed, to the effect that Mr. Applebaum should purchase at a foreclosure sale, wherein and whereby the rights of all the stockholders and bondholders would be cut off, and then hold the property for the benefit of all these people. Applebaum had in the foreclosure case been adjudged the owner of these bonds to the amount of $226,500, and had invested $108,274.24 therein.

It is undisputed that Applebaum refused to use the bonds of the Hude estate in purchasing at the foreclosure sale. We are unable to find anywhere in this record, except in the testimony of complainant Sullivan, the idea or the fact that if defendant Applebaum found it necessary (after an honest endeavor to save the property for the old corporation) to resort to a foreclosure of the mortgage, that he agreed to bid in the property for the benefit of these complainants, or anybody else. The testimony of complainant Sullivan, to the effect above stated, is so discredited by the testimony which he gave in the foreclosure case, and by his own affidavit and by his conduct, that we are unable to believe it. We have read with care the testimony of all these parties. We cannot copy it into this opinion without extending the same to an unreasonable length.

We cannot agree with complainants' counsel wherein they claim that the testimony of defendant Groesbeck supports their contention. Counsel for complainants contend that neither Mr. Tarsney nor Sullivan was a party to the foreclosure suit. We think that there is an inaccuracy in the finding of the circuit judge upon this point. The record shows that Mr. Tarsney was cited in as a party to the hearing upon which the supplemental decree was made. Sullivan was present and testified in that matter. It is undisputed that Sullivan, as the then owner of certain other bonds, united with Applebaum in requesting the trustee to institute foreclosure proceedings. But can it be said, whether Tarsney and Sullivan were, or were not, formal parties, that they were not bound by the foreclosure decree? Whatever rights they had, in any event, were either as stockholders or bondholders. As stockholders they were represented by the mortgagor railway corporation, principal defendant in the foreclosure case. As bondholders they were represented by the trustee, the Detroit Trust Company, the complainant in the case. The decree of foreclosure ended their rights, both as stockholders and bondholders, just as effectually as if they had been made formal parties in the case. Most certainly upon the face of the proceedings when defendant Applebaum purchased at the foreclosure sale, the idea that the purchase was subject to a trust in favor of the bondholders is in direct conflict with the terms of the foreclosure decree, and the supplemental decree, which provided that any excess over the $108,274.24, and interest, derived from the sale, should be impounded and held by the receiver to await the further order of the court.

The conduct of the complainants in this case is worthy of some attention. A letter was written by T. E. Tarsney, on August 7, 1908, addressed to Mr. Applebaum, in which Mr. Tarsney uses the following language in connection with certain of the Yarnell Gold Cure stock then in the hands of Mr. Applebaum, and which was surrendered to Mr. Tarsney:

"I wish to state that I feel that you have done everything that you could reasonably be expected to have done in relation to my investments in the Detroit, Flint & Saginaw Railway, and that I am satisfied entirely and have no complaint whatever to make. I certainly wish you success.

"Yours truly,
"T. E. TARSNEY."

Now, it is well to consider for a moment what had been done by Applebaum up to that time. He had bid in the property for himself, and in his own name, for $50,000. He had given complainant Sullivan an option agreeing to sell this property absolutely. He had refused to Sullivan, on repeated occasions, to take anything but cash or bankable paper to transfer the property. He had refused to use the Hude estate and the Tarsney personal bonds, either in bidding upon or making payment on his bid of the purchase price of the road. He had refused to have Mr. Tarsney and his friends associates in the enterprise with him as partners. He had repeatedly stated that he would not enter into any reorganization scheme with the other bondholders and creditors. These acts, which were all inconsistent with the claim of the complainants as advanced in this case, together with many others, were known to Mr. Tarsney when he made the above declaration in writing. It seems almost incredible to suppose that at that time Mr. Tarsney had any notion whatever of asserting such a claim as is asserted in this case. Should not said letter operate both as a release and estoppel? Sullivan's statement in writing at the time of the transaction with Peter when he gave the $2,000 note, although at a prior date, is equally significant as showing his understanding of conditions at that time, to wit:

"SAGINAW, M., Oct. 11, 1906.

"Mr. ISAAC APPLEBAUM:

"The assignment of the bonds and stock made to you by Mr. James B. Peter of Saginaw, this date, is understood by me [as] transferring all right, title and interest thereto to you, and free from any claim or equity on my

part, by reason of my having any separate transaction with said Peter or the payment or a promise to pay said Peter any consideration therefor by myself.

"T. G. SULLIVAN."

There were many reasons why Sullivan should want the debts of the old company adjusted and paid. He was personally liable for some of them, and he had incumbered some of his real estate to secure payment of a part of them. His subsequent conduct is entirely and wholly inconsistent with his present position in this suit. So we come back to the main question in this case. Did defendant Applebaum, on October 1, 1906, enter into an agreement whereby he obligated himself in any event to buy the railway, or bid it in at the foreclosure sale, in the interest of the bondholders and creditors? We feel constrained to say, after a careful review of the evidence in this case, that the only testimony in this record which tends to establish that agreement is the testimony of complainant Sullivan given upon the hearing of this case. This testimony is opposed to the testimony of each of the four defendants, Groesbeck, Henderson, Applebaum, and Mitshkun. It is opposed, also, to the testimony given by complainant Tarsney and complainant Sullivan himself on the foreclosure case. We cannot agree with the contention that it is corroborated by the testimony of complainant Tarsney given in this case. It is not corroborated by the innumerable circumstances which are undisputed in the case. Indeed, nearly every circumstance connected with the case is at war with it. We are unable to find that any such agreement was ever made. The overwhelming weight of the evidence leads us to the opposite conclusion.

There is much force in the position of defendants' counsel, that the alleged agreement to purchase this road, its property and its franchises, is such an oral agreement as would be void under the provisions of section 9509, 3 Comp. Laws. But we do not place our decision upon that ground; but upon the evidence in the case. As we

have already said, the findings of the learned circuit judge cover all the issues raised in the case; and, after a careful perusal of the record, we feel confident in saying that his findings are borne out by the great weight of, and, in most instances, the uncontradicted, testimony in the case. It is our conclusion that the decree of the circuit court, dismissing the bill, should be affirmed, with costs.

Decree below affirmed, with costs to defendants.

MOORE, MCALVAY, BROOKE and BLAIR, JJ., concurred.